1998-NMCA-112

965 P.2d 332

**DIVERSEY CORPORATION, Plaintiff–Counterdefendant–Appellant,**

v.

**CHEM–SOURCE CORPORATION and Curtis Hughes, Defendants–Counterplaintiffs–Appellees.**

**No. 17671.**

Court of Appeals of New Mexico.

July 6, 1998.

Certiorari Granted Aug. 19, 1998.

George A. Dubois, William J. Cooksey, Ralph W. Steele II, Dubois, Cooksey & Bischoff, P.A., Albuquerque, for Plaintiff-Counterdefendant-Appellant.

Vernon W. Salvador, Kent Winchester, Albuquerque, for Defendants-Counterplaintiffs-Appellees.

## OPINION

FLORES, Judge.

{1} Plaintiff–Counterdefendant–Appellant, Diversey Corporation (Diversey), appeals from a judgment entered after a jury awarded Diversey $6,590.20 on a claim for unpaid debt, but also awarded Defendants–Counterplaintiffs–Appellees, Chem–Source Corporation and its owner, Curtis Hughes (collectively, Chem–Source), $128,500 for tortious interference with existing and prospective contractual relations "and/or" $385,500 for violation of the Unfair Practices Act (UPA). *See* NMSA 1978, §§ 57–12–1 to –22 (1967, as amended through 1995). Although the jury found that Diversey's conduct was willful, Diversey does not appeal this finding or the judge's award of increased damages for willfulness.

{2} Diversey raises five issues on appeal: (1) whether jury instruction number five was an incorrect statement of the law; (2) whether the court erred in refusing Diversey's requested defamation instructions; (3) whether the court erred in allowing Dr. Parker, the expert for Chem–Source, to testify concerning lost profits without first establishing that Diversey caused the claimed losses; (4) whether the jury's damage verdict was excessive (because the jury relied on a mistaken measure of damages and because the jury failed to reduce the award to present value); and (5) whether the final verdict form, which included "and/or" language, resulted in double recovery. For the following reasons, we affirm on all but one issue. We remand solely to allow the trial court to enter a judgment that reduces the jury's award of future lost profits to present value.

## I. *FACTUAL BACKGROUND*

{3} Evidence and testimony at trial adduced the following information. Some of the facts set out below were disputed by the parties. Chem–Source, a corporation owned by Curtis Hughes (Hughes), distributed commercial cleaning supplies for Rocky Mountain Proclean (Proclean), a manufacturer. Prior to starting Chem–Source, Hughes was a successful distributor of commercial cleaning products for other companies. While distributing Proclean products, Randy Blackburn (Blackburn), a Proclean sales representative, provided sales and servicing assistance to Chem–Source.

{4} In 1990, Diversey purchased Proclean. At that time, Diversey assumed all of Proclean's contractual rights and obligations, including contract rights and obligations with distributors. Blackburn remained with Diversey until 1992. Once Blackburn left Diversey, Chem–Source no longer received assistance from Diversey regarding sales and servicing its accounts.

{5} When Diversey acquired Proclean, Hughes believed that Chem–Source would be able to distribute, not only the Proclean line of products, but also the superior Diversey line. However, this never happened. Initially, Mike Downey (Downey), a Diversey district manager, told Blackburn that Chem–Source would be able to distribute the Diversey line of products. However, when Chem–Source actually ordered Diversey products, Diversey took the order but never shipped the products. Later, Downey and Tom Fisher (Fisher), Diversey's sales area supervisor, told Blackburn that if Chem–Source clients wanted Diversey products, they would have to go to another distributor because Hughes was not going to be a distributor for Diversey products. Downey and Fisher also told Blackburn that Chem–Source was not important business for Diversey, and that if Blackburn wanted to receive his commissions, he would have to make sales through distributors other than Hughes because he would not be paid for the Chem–Source sales.

{6} Even Hughes' orders of non-Diversey products, such as Proclean products, were not being delivered promptly, so that Chem–Source's customer service suffered. In addition, Diversey began charging Chem–Source retail prices rather than distributor

prices. As a consequence of this billing problem, Diversey would put Chem–Source's account on hold until the billing problems were resolved. However, while the account was on hold, Diversey would not ship any of Chem–Source's orders. This, in turn, delayed delivery to Chem–Source's clients and limited Chem–Source's opportunity to make new sales or to service existing accounts.

{7} Diversey required Hughes to reveal confidential information on the types and quantities of products he was distributing, as well as customer lists with sales information. Hughes considered this information confidential and did not want to reveal it to Diversey because the two companies were competing for the same customers. Hughes did eventually turn over the information in order to continue receiving shipments of cleaning products.

{8} During the same time period Hughes discovered that Chem–Source dispensers and equipment were removed from his client's businesses without his knowledge, that they were replaced with Diversey dispensers and equipment, and that Diversey was "blitzing" his clients. The blitzing caused Chem–Source to lose at least six of its best customers. The blitz involved Diversey representatives going to Chem–Source customers and telling them falsely that they would need to find a new distributor because Chem–Source would no longer be in business. Diversey representatives approached Sharon DiVasto and Steve Armbrecht, two restaurant owners who did business with Chem–Source, and told them that Diversey was going to force Curtis Hughes out of business. In addition, Hughes testified that Diversey told other Chem–Source clients that Chem–Source was going bankrupt. The blitz was an organized and concerted campaign by Diversey representatives to spread misleading information about Chem–Source to its customers in an attempt to convince those customers to use Diversey as their supplier.

{9} In late 1991 or early 1992, Chem–Source purchased a second business, Dynachem. In some ways, Dynachem was operated as a separate business from Chem–Source. For example, the Dynachem accounts were maintained in a separate ac-counting system on Chem–Source's computer. Dynachem had its own phone number and separate advertising. In other ways, Dynachem and Chem–Source were operated as one business: both were operated out of the same office, operated with the same assets and capital, and operated under the management of Hughes. Moreover, the two companies filed the same tax returns. Hughes intended to merge the two companies in order to sell the more profitable products, but the problems caused by Diversey prevented this merger.

{10} In the spring of 1993, Hughes found another supplier and stopped distributing Proclean products for Diversey. Thereafter, Diversey sued Chem–Source for the amount due on its account, and Chem–Source counterclaimed for breach of contract, tortious interference with contractual relations, and violation of the UPA. Diversey appeals the jury's verdict on the tortious interference and UPA claims.

## II. *DISCUSSION*

### A. *Jury Instruction Number Five Was Not in Error*

{11} Diversey argues that jury instruction number five is an incorrect statement of the law because it erroneously defines a simple breach of contract as an unfair trade practice, and because it does not include four elements specifically required by our Supreme Court to prove a violation of the UPA. *See Ashlock v. Sunwest Bank,* 107 N.M. 100, 101, 753 P.2d 346, 347 (1988), *overruled on other grounds by Gonzales v. Surgidev Corp.,* 120 N.M. 133, 140, 899 P.2d 576, 583 (1995). We uphold the instruction as given because Diversey failed to preserve the errors it now claims plague this instruction, and because the instruction, read as a whole, adequately states the law.

### 1. *Diversey Failed to Preserve Claimed Errors in Jury Instruction Number Five*

{12} Absent fundamental error, or questions involving general public interest or jurisdiction, an appellate court will not review claimed errors unless they were pre-

served for review. *See* Rule 12–216 NMRA 1998. The party claiming error must have raised the issue below clearly, *see Shelley v. Norris,* 73 N.M. 148, 152, 386 P.2d 243, 245 (1963), and have invoked a ruling by the court, *see* Rule 12–216(A), thereby giving the trial court an opportunity to correct any error, *see Garcia v. LaFarge,* 119 N.M. 532, 540, 893 P.2d 428, 436 (1995).

■ {13} Diversey's first argument is that the instruction as given improperly defines breach of contract as an unfair trade practice. *See Stevenson v. Louis Dreyfus Corp.,* 112 N.M. 97, 99, 811 P.2d 1308, 1310 (1991) (breach of contract without misrepresentation is not necessarily a violation of UPA). Although we acknowledge that Diversey attempted to bring this alleged error to the trial court's attention, we nevertheless hold that Diversey failed to preserve the issue. Diversey first objected to this instruction as it was originally drafted. In specific response to Diversey's objection, the trial court amended the instruction to include "knowingly made misrepresentations of any kind." Diversey did not object further. The following day, however, Diversey again objected to the instruction, stating that "[t]he Unfair Practices Act requires [the breach to] be falsely promised and knowingly failure to deliver." The trial judge responded that the original amendment resolved the problem and that she would give the instruction as amended. At that time, Diversey should have clarified its objection by stating that the instruction, even as amended, was ambiguous. This would have alerted the trial judge that Diversey was not satisfied with the amendment and created a record of Diversey's true complaint. Without further explanation of why the amendment did not completely cure the error, the trial court rightfully presumed that the problem had been corrected and Diversey was satisfied with the correction.

■ {14} Diversey also claims that the instruction is flawed because the trial court failed to instruct on the four *Ashlock* requirements for establishing a UPA violation. *See Ashlock,* 107 N.M. at 101, 753 P.2d at 347. We will not address this argument because the error was not preserved for review. Di-

versey made no oral argument and tendered no written instruction specifically alerting the court to these four requirements. *Cf. Shelley* 73 N.M. at 152, 386 P.2d. at 245 ("The mind of the trial court must be clearly alerted to a claimed non-jurisdictional error in order to preserve it for appeal.").

{15} Diversey claims that its requested jury instruction number nine addresses the *Ashlock* requirements. However, this is simply not the case. Requested instruction number nine, although mentioning the UPA in its introductory paragraph, essentially addresses Chem–Source's tort claim, not the UPA violation, and does not include the *Ashlock* requirements. *See Ashlock,* 107 N.M. at 101, 753 P.2d at 347. Without an objection directed to the specific problem now raised on appeal, or without tender of a correct written instruction, Diversey will not be heard to complain of error in this instruction now. *See* Rule 12–216.

2. *Jury Instruction Number Five is an Adequate Statement of the Law*

■ {16} Even assuming that Diversey preserved this issue, its argument still fails. "In reviewing alleged errors relating to jury instructions, this Court will consider whether all of the instructions, when read and considered together, fairly present the issues and the law applicable thereto." *Kestenbaum v. Pennzoil Co. .,* 108 N.M. 20, 26, 766 P.2d 280, 286 (1988); *see also McCarson v.. Foreman,* 102 N.M. 151, 158, 692 P.2d 537, 544 (Ct.App. 1984) (when jury instructions, considered as a whole, fairly present the issues and applicable law, they are sufficient). In considering whether a jury instruction adequately presents the issues and the applicable law, the reviewing court considers the instruction in light of the evidence presented at trial. *See, e.g., Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973); *Resnover v. Pearson,* 965 F.2d 1453, 1463 (7th Cir.1992) ("When reviewing a challenge to a jury instruction, we must view the instructions as a whole and consider the challenged instruction both in the context of the other instructions given and in light of the allegations of the complaint, the opening and closing arguments, and the evidence of the rec-

ord."). Here, after considering the evidence of Diversey's intentionally predatory behavior, as well as the language of the instruction itself, we conclude that instruction number five adequately presents the applicable law. We find no error.

{17} Diversey relies on *Stevenson* to argue that jury instruction number five misstates the law by equating an ordinary breach of contract with an unfair trade practice. *See Stevenson,* 112 N.M. at 99, 811 P.2d at 1310. The gravamen of an unfair trade practice is a misleading, false, or deceptive statement made knowingly in connection with the sale of goods or services. *See* § 57–12–2(D); *Stevenson,* 112 N.M. at 100, 811 P.2d at 1311. A jury instruction that fails to include the element of misrepresentation, falsity, or deception, would certainly be an inaccurate statement of the law, as it was in *Stevenson,* 112 N.M. at 100, 811 P.2d at 1311. There, the jury instruction made a failure to deliver goods, without more, a violation of the UPA. In that case, the entire instruction read:

> To establish the claim of a violation of the Unfair Trade Practices Act, Plaintiff has the burden of proving the following contention:
>
> 1. Defendant failed to deliver the quantity of goods contracted for.
>
> Plaintiff contends and has the burden of proving that Defendant's violation of the Unfair Trade Practices Act caused his damages.
>
> Defendant denies the contentions of Plaintiff.

*Id.* at 99, 811 P.2d at 1310. According to our Supreme Court, "[u]nder the instruction, the mere fact that [Defendant] failed 'to deliver the quantity of goods or services contracted for' would result in every breach of contract case being a violation of the Act" because the instruction fails to require a knowing misrepresentation be made in connection with the breach of contract. *Id.* at 99–100, 811 P.2d at 1310–11.

{18} By contrast, the instruction given here, read in its entirety and in the context of the evidence presented, adequately expresses the requirement that a knowing misrepresentation be made in conjunction with a failure to deliver the goods promised. Under the instruction given in this case, a simple breach of contract would not result in a UPA violation. Here, instruction number five stated: "To establish the claim of unfair trade practices, Curtis Hughes and Chem–Source have the burden of proving the following contention: that Diversey knowingly made misrepresentations of any kind in at least one of the following ways: ... Diversey failed to deliver the quantity of goods and services contracted for." Although this instruction may be inartfully drafted, it does adequately express the requirements of the law. *See* §§ 57–12–2(D)(17), 57–12–3. To find for Chem–Source, the jury had to find that Diversey made a knowing misrepresentation concerning its delivery of goods to Chem–Source. Given the extensive evidence of Diversey's bad faith dealings with Chem–Source, including its approaching Chem–Source customers with fallacious information concerning the future of Chem–Source, its removing Chem–Source dispensers and equipment from the premises of Chem–Source clients, and its refusal to ship products to Chem–Source because of trumped-up billing problems, among other things, the jury could, and did, find that Diversey knowingly misrepresented to Chem–Source that it would sell certain products to Chem–Source, which it then failed to deliver. Diversey's conduct amounts to more than a simple failure to deliver. The instruction is consistent with both the statute and its common law interpretation. *See, e.g., Stevenson,* 112 N.M. at 97, 811 P.2d at 1308; *Ashlock,* 107 N.M. at 100, 753 P.2d at 346.

### B. The Trial Court Properly Refused Diversey's Requested Defamation Instructions

{19} Diversey argues that the trial court erred by rejecting its requested instructions on defamation. Although Diversey requested that these instructions be included as elements of the intentional interference claim, the court rejected the instructions because they would add an element to the UPA claim and Chem–Source had not brought a claim for defamation. For reasons other than those given by the

trial judge, we uphold the trial court's decision to reject the proposed jury instructions. *See Westland Dev. Co. v. Romero,* 117 N.M. 292, 293, 871 P.2d 388, 389 (Ct. App.1994) ("An appellate court will affirm a lower court's ruling if right for any reason."). As a preliminary matter, we note that because Diversey did not request the defamation instructions for purposes of the UPA violation, we need not address whether the trial court's reasoning regarding the UPA was proper. Rather, we focus our attention on whether the defamation instructions should have been given as part of the tort claim. We affirm the trial court's decision not to give the defamation instructions because Chem–Source should not have been required to prove that Diversey defamed Chem–Source in order to prevail on its intentional interference claim.

■ {20} To prove intentional interference with (existing or prospective) contractual relations, a plaintiff must prove that the defendant improperly interfered with the plaintiff's contractual relations, either through improper means or improper motive. *See M & M Rental Tools, Inc. v. Milchem, Inc.,* 94 N.M. 449, 454, 612 P.2d 241, 246 (Ct.App.1980). *See generally* 4 Restatement (Second) of Torts §§ 766, 766A, 766B (1977) (providing a broad overview of the historical development of the tort, as well as an overview of the elements of the tort). Because Chem–Source's claim rests on a basis of improper means, we will not address improper motive here. According to Chem–Source, the improper means used by Diversey included disparagement of Chem–Source. Consequently, Diversey argues that Chem–Source should be required to prove the tort of defamation to prevail on its intentional interference claim. Chem–Source, as the trial court ruled, did not bring a defamation claim, however, and we hold that New Mexico law does not require that wrongful or improper means under contractual interference first satisfy the elements of another, independent tort. Indeed, such a requirement would defeat the very purpose of recognizing the tort of intentional interference, which is to impose liability for contractual interference when the means of interfering was not tortious or otherwise unlawful in itself. *See* Restatement,

*supra,* § 766 cmt. c, at 8–9 (discussing *Lumley v. Gye,* 118 Eng.Rep. 749 (Q.B.1853), which first recognized the tort of intentional interference with contractual relations). Although tortious behavior and behavior that violates other statutes will amount to improper conduct, the conduct required by this tort need not be tortious in itself, for it is the interference that is the basis of the liability—not another underlying tort.

{21} Our position that proof of an underlying, independent tort, such as defamation, is not required to prove intentional interference is bolstered by the fact that this Court has adopted a definition of improper means that includes not only tortious behavior, but all "predatory" behavior. *See M & M Rental Tools,* 94 N.M. at 454, 612 P.2d at 246. Predatory behavior is behavior " 'wrongful by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession.' " *Id.* at 455, 612 P.2d at 247 (quoting *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.,* 283 Or. 201, 582 P.2d 1365, 1371 (1978)). Thus, predatory behavior includes behavior that is not otherwise tortious, but which becomes tortious when it results in a wrongful interference with another's contractual relations. If we were to require proof of an underlying tort, we would disregard the reasons for the creation of the intentional interference claim, and impose unnecessary, and unintended, hurdles for a plaintiff bringing such a claim. We decline to do so. The trial court's denial of Diversey's defamation instructions was proper. *Cf. Kirk Co. v. Ashcraft,* 101 N.M. 462, 466, 684 P.2d 1127, 1131 (1984) ("It is not error to deny requested instructions when the instructions given adequately cover the law to be applied."); *McCarson,* 102 N.M. at 158, 692 P.2d at 544 (when jury instructions, read as a whole, fairly present the issues and applicable law, they are sufficient).

C. *The Trial Court Properly Allowed Dr. Parker to Testify Concerning Lost Profits*

{22} Diversey argues that the trial court erred by admitting the testimony of Dr. Parker, Chem–Source's expert, concerning

Chem–Source's lost profits because Dr. Parker improperly included the losses of Dynachem in his calculations and did not establish that Diversey's conduct caused the lost profits.

### 1. Improper Inclusion of Dynachem Losses Not Preserved

■ {23} Diversey failed to preserve for review its argument that Dr. Parker's inclusion of Dynachem data in his estimate of Chem–Source's lost profits was error. Diversey argues that it preserved the error by objecting, on four separate occasions, that Dr. Parker failed to show that Diversey caused Chem–Source's losses. These objections, however, were not specific enough to alert the trial court that the problem was the inclusion of Dynachem data. See Shelley, 73 N.M. at 152, 386 P.2d at 245. Neither the timing nor the wording of the causality objections linked Diversey's objections with the Dynachem data. Only once did Diversey's objection occur after argument or testimony concerning Dynachem: immediately after the voir dire of Dr. Parker, which included questioning regarding Dynachem, Diversey objected on causality grounds. However, even this objection was too general to alert the court to the problem with the Dynachem evidence. Diversey's causality objections never mentioned Dynachem to the court. Thus, we do not see how Diversey expected the trial court to understand that the causality objection was intended to invoke a ruling on the introduction of Dynachem evidence.

{24} In fact, the trial judge indicated that she did not understand Diversey's objections to be raising issues concerning Dynachem. In a post-trial hearing on Diversey's motion for relief and remittitur, the trial judge characterized Diversey's objections to Dr. Parker's testimony as concerning the lack of substantial evidence of causation, and stated that "Dynachem's issue was not specifically addressed to the Court at the time when the Court would have and could have dealt with it[.] ... I simply didn't have the opportunity to address that particular issue." Thus, we hold that Diversey did not preserve this error for review.

### 2. The Trial Court Did Not Abuse its Discretion by Admitting Dr. Parker's Testimony Because a Proper Foundation Was Laid

{25} "The admission of expert testimony is within the sound discretion of the trial judge. The admission of expert testimony will not be reversed unless there has been an abuse of the trial court's discretion." Sanchez v. Molycorp, Inc., 103 N.M. 148, 152, 703 P.2d 925, 929 (Ct.App.1985) (citations omitted). We find no such abuse in this case.

■ {26} Diversey argues that Dr. Parker's testimony was based on an assumption, not evidence, that Diversey caused Chem–Source's losses. Consequently, argues Diversey, there was no foundation for Dr. Parker's expert testimony. We disagree. Unlike some medical malpractice cases, in which the expert must provide the facts showing that defendant caused plaintiff's injuries, see, e.g., Eis v. Chesnut, 96 N.M. 45, 46, 627 P.2d 1244, 1245 (Ct.App.1981), it is permissible for non-experts in cases like the instant one to lay the foundation for an expert's testimony, see State v. White, 1997–NMCA–059, ¶ 7, 123 N.M. 510, 943 P.2d 544 ("The foundation for the relevance of the expert testimony may be supplied by other witnesses."). Here, other witnesses provided the requisite foundation.

{27} For example, Hughes testified that Diversey "blitzed" his customers, causing him to lose at least six of his best accounts. According to Hughes, the blitz involved Diversey representatives going to Chem–Source customers and telling them that they would need to find a new distributor because Chem–Source would no longer be in business. Both Sharon DiVasto and Steve Armbrecht, two restaurant owners who did business with Chem–Source, testified that Diversey representatives approached them at their restaurants, and told them that Diversey was going to force Curtis Hughes out of business. In addition, Hughes testified that Diversey told other Chem–Source clients that Chem–Source was going bankrupt. Downey, a Diversey district manager, admitted to contacting four of Chem–Source's clients (La Residencia, the Bull n' Bush, Red Cloud Cafe, and the Palace Restaurant), and Fisher, Diversey's sales area

representative, also contacted two additional Chem–Source clients (Grandma's Restaurant and Manzano del Sol). Fisher also testified that he wrote an internal memo summarizing the "recent blitz on Chem–Source accounts."

{28} In addition to evidence that Diversey "blitzed" Chem–Source customers, both Blackburn, now a Diversey sales representative, and Hughes testified that Diversey would not ship Diversey products to Chem–Source. Initially, Downey told Blackburn that Chem–Source could distribute the Diversey line of products, but, when Chem–Source actually ordered those products, Diversey took the order but failed to ship the Diversey products. Blackburn testified that, later on, Downey and Fisher told him that if Chem–Source clients wanted Diversey products, they would have to go to another distributor because Hughes was not going to be a distributor for Diversey products. Blackburn testified that Downey and Fisher told him that Chem–Source was not important business for Diversey, and that if Blackburn wanted to receive his commissions, he would have to make sales through distributors other than Hughes because he would not be paid for the Chem–Source sales.

{29} Even Hughes' orders of non-Diversey products, such as Proclean, were not being delivered promptly, so that Chem–Source's customer service suffered. Additionally, Diversey began charging Chem–Source retail prices rather than distributor prices. The consequence of this process was that Diversey would put Chem–Source's account on hold while Diversey and Chem–Source corrected any billing or payment problems resulting therefrom. However, while the account was on hold, Diversey would not ship any of Chem–Source's orders, thereby delaying delivery to Chem–Source's clients, and limiting Chem–Source's ability to make new sales or to service existing accounts.

{30} Diversey stopped participating in cooperative sales calls with Hughes, and stopped servicing Chem–Source equipment without informing Hughes. Hughes testified that Chem–Source dispensers and equipment were removed from his clients' businesses without his knowledge and that they were replaced with Diversey dispensers and equipment. All this evidence, testified to by witnesses other than Dr. Parker, was sufficient to permit a jury to conclude that Diversey caused Chem–Source's damages. Accordingly, this evidence adequately established the foundation for Dr. Parker's testimony on damages.

{31} Moreover, Dr. Parker's testimony is not precluded simply because the evidence outlined above is disputed. In cases where someone other than the expert lays the foundation, "a dispute concerning the factual predicate for the expert testimony would not justify exclusion of the testimony." *White*, 1997–NMCA–059, ¶ 7, 123 N.M. 510, 943 P.2d 544. Rather, "[t]he conflicts in the testimony ... are matters for resolution by the trial court[,]" *Sanchez*, 103 N.M. at 152, 703 P.2d at 929, and, in particular, for resolution by the jury, *see Ranchers Exploration & Dev. Corp. v. Miles*, 102 N.M. 387, 390, 696 P.2d 475, 478 (1985) ("It is up to the jury to weigh the testimony, determine the credibility of witnesses, reconcile inconsistent or contradictory evidence, and say where the truth lies ."). Here, the evidence that Diversey caused Chem–Source's losses was sufficient to allow Dr. Parker to testify with respect to the amount of Chem–Source's damages.

{32} Finally, "[a]n expert's opinion is not impermissibly speculative or lacking as to a factual basis where the expert gives a satisfactory explanation as to how he arrived at his opinion." *Sanchez*, 103 N.M. at 152, 703 P.2d at 929. In a personal injury case in which plaintiffs challenged the defense expert's testimony as lacking foundation, this Court determined that if the basis for the expert's opinion

appears unsatisfactory or based on unsatisfactory factors it is subject to being stricken.

The facts show that the basis for [the expert's] testimony came from the testimony of the plaintiffs, and other witnesses. This being the case, the question of weight to be given [the expert's] testimony was one for the jury to determine.... We conclude that the trial court did not err in allowing the testimony ... because he ex-

plained how he arrived at his expert testimony, and because it was based on facts which were before the jury.

*Harrison v. ICX, Illinois–California Express, Inc.*, 98 N.M. 247, 250, 647 P.2d 880, 883 (Ct.App.1982) (citations omitted). Similarly, in this case, Dr. Parker provided a detailed explanation of his methodology and based his opinion on facts in evidence and properly before the jury.

### D. *The Jury's Award Was Not Excessive*

{33} Diversey argued both in its brief in chief and at oral argument that the jury failed to reduce its award for future lost profits to present value. *Cf., e.g., Monessen Southwestern Ry. Co. v. Morgan*, 486 U.S. 330, 339, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988) (damages awards should be based on present value); *State ex rel. Martinez v. Lewis*, 116 N.M. 194, 209, 861 P.2d 235, 250 (Ct.App.1993) ("future damages ... must be discounted to present value"). Because Chem–Source conceded at oral argument that the jury did not reduce its verdict to present value, we remand to allow the trial court to enter judgment in the appropriate amount.

{34} In addition, Diversey argues that the verdict is excessive because it is based on a mistaken measure of damages. According to Diversey, errors in Dr. Parker's testimony created the mistaken measure of damages. In particular, Diversey attacks Dr. Parker's (1) inclusion of Dynachem sales data in the damage calculation; (2) assumption that statements made by Diversey about Chem–Source had any affect on Dynachem sales; (3) reliance on hearsay regarding Chem–Source filing for bankruptcy; and (4) projections of future salary and wage expenses. For reasons discussed below, we disagree and affirm the damage verdict, subject only to our order that the award for lost future profits be reduced to present value.

{35} New Mexico courts "will not find an award of damages excessive except in extreme cases." *Ranchers Exploration & Dev.*, 102 N.M. at 390, 696 P.2d at 478. A jury award is excessive if it "is not supported by substantial evidence, or [if] the jury ... employed an incorrect measure of damages."

*Id.* Under this standard of review, the damages awarded here are not excessive. The amount awarded precisely matches Dr. Parker's estimate of Chem–Source's losses attributable to Diversey's conduct. *Cf., e.g., Gonzales v. General Motors Corp.*, 89 N.M. 474, 480, 553 P.2d 1281, 1287 (Ct.App.1976) (damages were excessive where the verdict exceeded the plaintiff's own estimate of damage, and where, in closing argument, plaintiff's attorney claimed that plaintiff sustained injuries not supported by the evidence). Because we have already determined that a proper foundation was laid for Dr. Parker's testimony and that sufficient evidence was presented to the jury showing that Diversey caused Chem–Source's losses, the measure of damages was not incorrect and was supported by substantial evidence. Thus, we conclude that the jury's award of damages was not excessive.

### E. *The "and/or" Language Included in Verdict Form 2A Was Stipulated to By The Parties and Any Error Was Not Preserved*

{36} Diversey argues that including "and/or" in the verdict form rendered the jury's verdict ambiguous, and as a consequence, Chem–Source improperly received double recovery for the same injury. Two interrelated reasons persuade us not to reverse the jury's award based on the giving of an arguably erroneous verdict form. First, we will not consider arguments concerning matters that occurred off the record and that were not memorialized on the record after-the-fact either by the court or by the parties. *See State v. Reynolds*, 111 N.M. 263, 267, 804 P.2d 1082, 1086 (Ct.App.1990) ("Matters outside the record present no issue for review."). Here, there was no discussion on the record concerning whether to add "and/or" to the verdict form. The trial judge commented on the record that "and/or" was added to the verdict form by stipulation of the parties, and there was no objection or other reaction by counsel on the record. Because the record indicates there was a stipulation, we presume that the "and/or" language included in Verdict Form 2A was part of the stipulation. We will not consider the non-record recollec-

tions of counsel regarding the stipulation of this language.

{37} Second, Diversey did not object to the inclusion of this "and/or" language at trial, and thus did not preserve the error for review. *See Thompson Drilling, Inc. v. Romig,* 105 N.M. 701, 703, 736 P.2d 979, 981 (1987) ("[T]he right to object to an improper verdict is waived when not made at the time of the return of the verdict and cannot be reclaimed and revived by resorting to a motion for a new trial or on appeal."). Diversey argues that its failure to object should not bar review because it had no opportunity to do so. *See* Rule 12–216(A). We disagree. The trial judge, immediately after announcing that "and/or" would be added to the verdict form by stipulation of the parties, specifically gave the parties an opportunity to respond when she asked if that addition was "[c]orrect?". We do not see how, under these circumstances, Diversey can claim it had no opportunity to preserve the error. Because the trial court was not afforded an opportunity to correct any potential confusion or ambiguity caused by adding "and/or" to the verdict form, we will not review any error claimed as a result of including this language, including, whether or not Chem–Source's damages award amounted to double recovery.

{38} We note, however, that this ambiguous verdict issue highlights the extraordinary importance of preservation for appellate review. Preservation serves many purposes. It can prevent the need for appeal entirely by allowing the trial court to correct errors, *see Garcia,* 119 N.M. at 540, 893 P.2d at 436, and when appeal is necessary, preservation creates a record from which this Court can make informed decisions. *See Morningstar Water Users Ass'n, Inc. v. Farmington Mun. Sch. Dist. No. 5,* 120 N.M. 307, 320, 901 P.2d 725, 738 (1995) (Absent preservation, we are "[w]ithout an adequate trial record [and] have no information upon which to base a judgment."). Thus, preservation is not simply a technical bar to review employed by this Court to eliminate issues. *See Gracia v. Bittner,* 120 N.M. 191, 195, 900 P.2d 351, 355 (Ct.App.1995) ("[T]he preservation requirement should be applied with its

purposes in mind, and not in an unduly technical manner to avoid reaching issues. . . .").

{39} Although it appears to us that Chem–Source did not recover twice for the same injury because of the "and/or" language, *see Central Sec. & Alarm Co. v. Mehler,* 1996–NMCA–060, ¶ 12, 121 N.M. 840, 918 P.2d 1340 (where plaintiff pursues several theories of recovery and liability is found on each, plaintiff must "make an election among awards *if* duplication or double recovery would otherwise result") (emphasis added), we do not reach this question because it was not preserved below. Preservation here would have served multiple functions. First, a timely objection to the verdict would have allowed the trial court to send the jury back to the jury room to clarify its verdict, thereby correcting any error. *See Waisner v. Jones,* 103 N.M. 749, 750, 713 P.2d 565, 566 (Ct.App.1986) ("The normal procedure in cases of inconsistent or ambiguous verdicts is for the court to direct the jury to return to the jury room to reach, upon further deliberation, an agreement on a correct form of verdict."), *rev'd on other grounds,* 107 N.M. 260, 262, 755 P.2d 598, 600 (1988). Second, the same objection would have developed the record (by adding argument of counsel, by sending the jury back to clarify the verdict, or by allowing the court to poll the jurors concerning the verdict), so that this Court could perform an informed review. Thus, even though we do not think it was accidental that the jury's combined award for the tort and for the UPA violation precisely matched the expert's computation of Chem–Source's loss, we are unwilling and unable to decide this question.

{40} Finally, we will not address this question as a matter of fundamental error, as Diversey urges. First, the fundamental error doctrine generally does not apply in civil cases, *see Gracia,* 120 N.M. at 196, 900 P.2d at 356, and does not apply "where the asserted error inheres solely in difficulties with jury instructions." *Id.* Like jury instructions, verdict forms direct the jury regarding how to calculate damages. As such, error in a civil verdict form is similar to error in civil jury instructions, and is generally not fundamental. *Cf. id.* This

Court, in *Gracia,* recounted a short series of civil cases in which the fundamental error doctrine was applied. In those cases, substantial justice was not done, the court was deprived of jurisdiction to hear the case, the issue was one of general public interest that would impact a large number of litigants, or, there was a "total absence of anything in the record of the case showing a right to relief[.]" *Id.* at 197, 900 P.2d at 357. The case before us presents none of these exceptional circumstances. While we decline to adopt a rule determining when error in civil cases amounts to fundamental error, we note that it should be recognized sparingly, and only in extraordinary circumstances. We are satisfied that there is no such error presented in the case before us today. The trial court's judgment on the verdict is therefore affirmed.

## III. *CONCLUSION*

{41} For the foregoing reasons, we hold that jury instruction number five was not in error; the trial court properly rejected Diversey's requested defamation instructions; and, the trial court properly allowed the Chem–Source expert to testify regarding Chem–Source's lost profits. In addition, we hold that the jury's award was not excessive because it was not based on a mistaken measure of damages and because Diversey failed to preserve any error regarding the addition of "and/or" to the verdict form. Because Diversey did not preserve this claimed error, we do not reach the question of double recovery. Finally, we remand so that the trial court can reduce the award for future lost profits to present value.

{42} **IT IS SO ORDERED.**

BOSSON, J., concurs.

APODACA, Judge (concurring in part, dissenting in part.)

{43} I respectfully dissent from the majority's determination under subsection II(A)(1) of the opinion that Diversey failed to preserve the claimed error in Jury Instruction No. 5. I also dissent from the majority's holding under subsection II(A)(2) that the same instruction was a correct or even adequate statement of the law. I concur only in the remaining portion of the majority's opinion.

## I. PRESERVATION

{44} Contrary to the opinion's holding, I believe that the transcript and record clearly demonstrate that Diversey adequately and properly objected to the amended instruction and preserved the issue for our review on appeal.

{45} When Diversey first objected to the instruction, the trial court, after considering arguments of opposing counsel, inserted the word "knowingly" to satisfy Diversey's objection. After that amendment, Diversey later objected to the instruction a second time and for a different reason. This occurred as follows:

> [Diversey's trial counsel]: Yes, Your Honor.... We believe that in the context which it is written, that's an incorrect statement of the law under the Unfair Practices Act. It is not a breach of contract. An unfair trade practice is not a breach of contract. The Unfair Practices Act requires it be falsely promised and knowingly failure to deliver.
>
> This just—if you fail to deliver goods, you've got [trebled] damages.
>
> [Trial Court]: I've already taken care of that by saying this has to be done by known misrepresentations. In other words, you're misrepresenting what the person's going to be able to get. So this will be given as modified.

After that exchange took place, the trial court and trial counsel moved on to other instructions.

{46} Diversey's second objection indicates to me that it contested the amended instruction, making clear to the trial court that its insertion of the word "knowingly" had not corrected the problem Diversey still saw as existing in the instruction. The objection referred to the instruction "in the context which it is written." This language indicates that Diversey considered the trial court's previous insertion of the word "knowingly" in objecting a second time.

{47} Additionally, the rationales of Diversey's first and second objections differ. The first objection concerned omission of the word "knowingly." The second objection, on the other hand, concerned the distinction between an unfair practice and a breach of contract. The difference in rationales illustrates that Diversey objected to the instruction even with the insertion of the word "knowingly."

{48} Considering the substance of these objections, which should have alerted the trial court that the amendment did not cure the instruction, it is difficult to understand why the trial court insisted that her inclusion of the word "knowingly" cured the problem. In light of these objections and the context in which they were made, I also do not comprehend what else Diversey could have done to have alerted the trial court that there was still a problem with the instruction, even as first modified.

{49} I respectfully disagree with the majority's essential holding that more should be expected of a litigant. Consequently, I would hold that Diversey preserved this claimed error by properly raising the issue below and invoking a ruling by the trial court. *See Shelley,* 73 N.M. at 152, 386 P.2d at 245; Rule 12–216(A).

## II. JURY INSTRUCTION NO. 5

{50} I also disagree with the majority's opinion that Jury Instruction No. 5 was an adequate statement of the law. The instruction read as follows:

> To establish the claim of unfair trade practices, Curtis Hughes and Chem–Source have the burden of proving the following contention: that Diversey knowingly made misrepresentations of any kind in at least one of the following ways:
>
> . . . .
>
> 5. Diversey failed to deliver the quantity of goods and services contracted for.

{51} I would interpret the instruction to mean that a failure to deliver contracted goods or services constituted a knowing misrepresentation. I believe the structure and language of the instruction supports this interpretation. It is a reasonable interpretation and one the jury probably made or could have easily made. The instruction was contrary to *Stevenson,* 112 N.M. at 99–100, 811 P.2d at 1310–11, in spite of the presence of the word "knowingly," because of the sentence structure used. Enumerating the failure to deliver after the wording "one of the following ways," under my reading of the instruction, indicated that failure to deliver was a way of knowingly making a misrepresentation. That is a misstatement of the law. The instruction did not clearly relate that a knowing misrepresentation must be made *in the failure* to deliver the quantity of goods and services contracted for, as the opinion states.

{52} 1 concede that the reading of the instruction made by the majority is another way of interpreting the instruction. But even assuming that the majority's interpretation is reasonable, I submit that we then have a situation in which the jury could have reasonably read the instruction in either one of two possible ways. If that is the case, then I would conclude that it was error to give an instruction that could so mislead the jury. If an instruction is worded in such a way that the jury can reasonably interpret it in a manner that is contrary to the law, isn't that a good reason to reject the instruction? Such an instruction, in my view, is flawed.

{53} The majority relies on authority holding that each instruction must be considered in context of other instructions and the evidence adduced at trial. I do not take issue with that premise. Yet, I fail to see how the other instructions and the evidence presented in this case could have prevented the jury from being misled by the flawed instruction.