SUTIN, Judge (specially concurring in part and dissenting in part). {60} I do not disagree with the Majority’s analysis and conclusion that Montanez precludes a holding that Ranack is j ointly and severally liable for all of the damages found by the jury. Majority Op. ¶¶ 15, 26-42.1 write separately to address what I believe to be an important issue raised in this case, namely, whether the work that Saenz was doing at the time of his death may be considered “inherently dangerous” as a matter of law. This issue was addressed by the district court, it is central to Plaintiffs argument on appeal, and in my view, it highlights an aspect of New Mexico case law that needs to be clarified. See id. ¶¶ 14, 21,23. Additionally, I disagree with the Majority’s decision to remand for a new trial as to damages to the estate, and as to that issue, I respectfully dissent. Id. ¶¶ 50-59. As a Matter of Law, Saenz Was Not Engaged in an Inherently Dangerous Activity {61} Acting pursuant to Section 41-3A-1(C), in Saiz, our Supreme Court established a public policy exception to several liability. 1992-NMSC-018,f34. The, Saiz Court began its analysis by recognizing the longstanding tort principle that, although an employer of an independent contractor is not generally responsible for the independent contractor’s negligence, the general rule has no application where, by virtue of work that is “inherently dangerous,” the employer has a nondelegable duty to ensure that precautions are taken. Id. ¶¶ 10-12, 15. In order to serve the policy underlying the imposition of a nondelegable duty to ensure thatsafety precautions are taken in regard to inherent dangers, the Saiz Court determined that employers should be held strictly liable for injuries caused by the failure to ensure such precautions. Id. ¶ 33. This, in turn, would promote the “special public policy” of protecting “third persons in an area of inherent danger” and encouraging “conscientious adherence to standards of safety where injury likely will result in the absence of precautions.” Id. ¶ 35. To effectuate these public policy considerations, the Saiz Court held that, pursuant to Section 41-3A-1(C)(4), “when precautions are not taken against inherent danger, the employer is jointly and severally liable for harm apportioned to any independent contractor for failure to take precautions reasonably necessary to prevent injury to third parties arising from the peculiar risk.” Saiz, 1992-NMSC-018, ¶¶ 34, 36. I refer to this public policy exception in Saiz as “the Saiz exception.” {62} The Saiz exception was derived from Sections 416 and 427 of the Restatement (Second) of Torts. Saiz, 1992-NMSC-018, ¶¶ 11-14. Section 416 of the Restatement (Second) of Torts, “Work Dangerous in Absence of Special Precautions,” provides that when one employs an independent contractor to do work that the employer “should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken,” the employer is subject to liability for physical harm to “others” caused by the independent contractor’s failure to exercise reasonable care to take the special precautions. This is so regardless of whether “the employer has provided for such precautions in the contract or otherwise.” Id. The Restatement’s illustrations of the application of Section 416 demonstrate that it was intended to apply to injured third parties who had no connection to the employer or to the independent contractor and who were injured through no fault of their own by virtue of the independent contractor’s failure to take precautions for the safety of the general public. See id. cmt. c, e (illustrating the intended application of Section 416). {63} Section 427 of the Restatement (Second) of Torts, “Negligence as to Danger Inherent in the Work,” subjects an employer of an independent contractor to liability for injuries to “others” caused by the independent contractor’s failure to take reasonable precautions against “a special danger” where the work for which the independent contractor was hired involves a “special danger to others which the employer knows or has reason to know to be inherent in or normal to the work[.]” Like those accompanying Section 416, the Restatement’s illustrations of the application of Section 427 demonstrate that it was intended to apply to circumstances in which a third party, a member of the public, with no relationship to the employer or to the independent contractor was injured as a result of the independent contractor’s failure to take precautions necessary to alert the public to a dangerous condition. See id. cmt. d (providing illustrations). {64} Recognizing that Sections 416 and 427 were different formulations of the same principle, the Saiz Court synthesized the respective sections in its holding that “one who employs an independent contractor to do work that the employer as a matter of law should recognize as likely to create a peculiar risk of physical harm to others unless reasonable precautions are taken is liable for physical harm to others caused by an absence of those precautions.” Saiz, 1992-NMSC-018, ¶ 15 (emphasis added); see id. ¶ 12 n.6 (stating that work that presents a “peculiar risk” or “special danger”[5] is “inherently dangerous”). {65} Plaintiff argues that Saenz’s work activity was inherently dangerous under the Saiz exception. Plaintiffs theory of inherent danger is based on an argument that the work activity that Saenz was performing when he died satisfies the three-part test established in Gabaldon, 1999-NMSC-039, ¶ 13, for evaluating whether an activity is inherently dangerous as a matter of law. {66} To be considered inherently dangerous as a matter of law, the at-issue activity must present a “peculiar risk.” Saiz, 1992-NMSC-018, ¶ 12 n.6 (stating that work is inherently dangerous because it presents a peculiar risk). In general, a “peculiar risk” is one that is outside the realm of personal experience, such that the person subjected to the risk is unfamiliar with the associated danger. See Valdez v. Yates Petroleum Corp., 2007-NMCA-038, ¶ 11, 141 N.M. 381, 155 P.3d 786 (stating that personal experience with an activity that results in familiarity with its dangers defies a conclusion that the risks of the activity are peculiar). In the context of construction work, a peculiar risk is one that is “not routinely encountered in the contractor’s line of work.” Sievers v. McClure, 146 P.2d 885, 889-90 (Alaska 1987). {67} Under the particular circumstances of this case, the work that Saenz was engaged in at the time of his death does not come within the legal definition of “inherently dangerous” work. Saenz was a skilled, experienced, and knowledgeable ironworker, equipped with fall-protection devices, aware of the hazards and required safety precautions of his trade, aware of normal routine matters of ironwork activity, and aware of the risk and hazard of falling from the height of an unfinished building. Furthermore, Saenz had worked on large construction projects, including having participated in the structural steel construction work of several buildings from the ground up. {68} Saenz had trained both of his sons, Jason and Marcus, to be ironworkers. Jason testified that Saenz was “extremely safety conscious” and that Saenz had trained him in ironwork safety precautions, including how to use a harness, a beamer, and a lanyard, and eventually, how to work at heights. Marcus, who was working with Saenz on the day of Saenz’s accident, testified that Saenz warned him “several times” not to work at heights or to walk across beams without being tied off. Saenz also advised his co-workers on safety matters, including “how to be careful},]” “how to tie off[,]” and “how to make sure that [they] were working safely at the job.” {69} Both Ranack’s and Alamo’s employees were required to use fall protection, including a requirement to tie off when working from elevated areas, which, according to Ranack’s policy, included any height over six feet. Thus, Saenz was required to be tied off when working at the height from which he fell. Evidence at trial established that the task that Saenz was attempting to perform when he fell could have been accomplished safely by, in keeping with the tie-off requirement, tying himself off to a joist or to the steel structure that was in place, or by using a ladder to reach his destination rather than walking across the concrete wall. Evidence at trial also showed that had Saenz tied off, he would have fallen no more than six feet before his lanyard would have arrested his fall. The foregoing factual presentation was credited both by the jury and by the district court. {70} Owing to his knowledge and experience in regard to the dangers of the ironwork trade and the fact that he was skilled in guarding against the dangers, the risk of death or injury from falling was not “peculiar” to Saenz. See Valdez, 2007-NMCA-038, ¶ 11 (stating that personal experience with an activity that results in familiarity with its dangers defies a conclusion that the risks of the activity are peculiar); see also Warnick v. Home Depot U.S.A., Inc., 516 F. Supp. 2d 459, 469 (E.D. Pa. 2007) (“All construction work involves a risk of some harm; only where the work is done under unusually dangerous circumstances does it involve a . . . peculiar risk.” (internal quotation marks and citation omitted)); Sievers, 146 P.2d at 889-90 (holding that, in the context of construction work, a peculiar risk is one that is “not routinely encountered in the contractor’s line of work” such that the employer of a contractor may only be held liable for “those hazards which the independent contractor is unlikely to be aware of and therefore unable to protect against”). To the contrary, Saenz was well aware of the risk of falling and the ever-present need to guard against that risk when working from heights. Because the presence of a peculiar risk is an inextricable element of “inherent danger,” the circumstances here do not support a conclusion that Saenz was engaged in an inherently dangerous activity. Saiz, 1992-NMSC-018, ¶¶ 11, 12 n.6 (explaining that work is inherently dangerous because it presents a peculiar risk). {71} Having concluded that the work that Saenz was performing does not come within the meaning of “inherent danger” as that term was used in Saiz, I further conclude that the three-part test established by the Gabaldon Court for evaluating whether an activity is inherently dangerous does not apply under the circumstances of this case. See Gabaldon, 1999-NMSC-039, ¶ 13 (establishing a three-part test to determine whether an activity should be considered “inherently dangerous” as that term was used in Saiz). Under the Gabaldon test, in order to conclude that an activity is inherently dangerous: (1) “the activity must involve an unusual or peculiar risk of harm that is not a normal routine matter of customary human activity”; (2) “the activity is likely to cause a high probability of harm in the absence of reasonable precautions”; and (3) “the danger or probability of harm must flow from the activity itself when carried out in its ordinary, expected way[.]” Id. Because they were derived from the Saiz definition of “inherent danger,” the factors of the Gabaldon test contemplated an unwitting plaintiff, a member of the general public, who is unable, by virtue of his lack of experience with the dangerous condition awaiting him, to guard against the risk presented by a dangerous condition. See id. ¶ 14 (“The first prong addresses the relative rarity of the activity and the concomitant lack of contact or experience with the activity and its dangers by the general public.” (internal quotation marks and citation omitted)). In light of Saenz’s knowledge and experience as an ironworking tradesman and that Saenz was a subcontractor’s employee, instead of a third party, the Gabaldon three-factor analysis is too limited an analysis through which to evaluate Saenz’s ironwork task. Even if the Gabaldon test were construed to apply to a circumstance in which the injured party was the employee of a subcontractor (contrary to Montanez), additional factors would have to be considered—particularly, the knowledge, skill, and experience of the injured party. Considering these additional factors would, for the reasons that I set forth earlier, lead to a conclusion that, under the circumstances of this case, Saenz was not engaged in an inherently dangerous activity. The District Court’s Denial of Plaintiff’s Motion for a New Trial Should Be Affirmed {72} On the special verdict form, the jury returned verdicts finding “the total amount of damages suffered by Plaintiff Virginia Saenz, Individually to be $482,000” and finding “the total amount of damages suffered by the Estate of Charles Anthony Saenz, Deceased, to be $0.” The jury ’ s verdict was read in open court. Plaintiffs counsel did not raise any issue in regard to estate damages prior to the discharge of the jury. Rather, the issue was raised for the first time more than two weeks after the trial ended, when Plaintiff filed a motion for a mistrial. In that motion, Plaintiff sought a mistrial in the post-jury-discharge proceeding based on an argument that, in arriving at the zero verdict for the Estate, the jury ignored “overwhelming evidence,” somehow measured by a substantial evidence standard, constituting jury abuse of discretion, including jury bias, prejudice, or passion. Ranack asserted in response that the elements of possible injury to Saenz and his estate was vigorously contested and set out examples of Saenz’s difficulties retaining employment, his criminal history, the impact of that history on his future employment opportunities, his having lived apart ftom his family while in prison and while not in prison, and his failure to support his offspring. The district court denied Plaintiffs mistrial motion, seemingly convinced that substantial evidence supported the verdict given the “number of items brought into evidence^]” including “[t]he criminal history of this individual, the fact that he had just gotten out of jail some months earlier, so on and so forth.” {73} “The jury’s verdict is presumed to be correct[,]” and “[wjhen the jury makes a determination and the trial court approves, the amount awarded in dollars stands in the strongest position known in the law.” Ennis v. Kmart Corp., 2001-NMCA-068, ¶ 27, 131 N.M. 32, 33 P.3d 32 (internal quotation marks and citation omitted). In this appeal, there exists no issue of bias, passion, prejudice, excessive verdict, or improper admission of evidence. There exists no contention of district court error in regard to the special verdict submitted to the jury. Plaintiff undisputedly did not preserve in the district court any concern with the special verdict. The jury was discharged with Plaintiffs foil knowledge of the verdict. {74} Instead of attacking the basis on which the district court concluded that substantial evidence existed, Plaintiff and the Majority rely on notions of an “inadequate” verdict, “contrary to the evidence,” and “overwhelming evidence” of the jury’s erroneous failure to award damages to the estate. Majority Op. ¶¶ 50-52, 54. The Majority buttresses its position with foreign (and in my view, inapplicable) authorities to support the assertion for the case at hand that the waiver rule does not apply. Ranack relies on Thompson, 1987-NMSC-039, ¶ 11, for the proposition that by failing to object to the jury’s verdict or otherwise alert the district court to the alleged error prior to the jury’s dismissal, Plaintiff waived the opportunity to raise any claim of error in regard to the amount of estate damages. I agree with Ranack. See id. (“[T]he right to object to an improper verdict is waived when not made at the time of the verdict and cannot be reclaimed and revived by resorting to a motion for a new trial or on appeal.”). For the reasons that follow in this dissent, the denial of Plaintiffs post-jury-discharge motion can and should be upheld, if not based on substantial evidence as determined by the district court, then, contrary to the Majority’s analysis, because Plaintiff failed to preserve an attack on the jury’s verdict and the fault lay not in verdict inadequacy but in Plaintiff’s litigation approach or failures. {75} Embedded in New Mexico law is the requirement that a party object to an improper verdict before the jury is discharged, and that the party that fails to object waives the right to a new trial after the jury’s discharge. Id.; Guest v. Allstate Ins. Co., 2009-NMCA-037, ¶ 36, 145 N.M. 797, 205 P.3d 844, reversed in part on other grounds by 2010-NMSC-047, 149 N.M. 74, 244 P.3d 342; G & G Servs., Inc., 2000-NMCA-003, ¶¶ 40-42; Diversey Corp. v. Chem-Source Corp., 1998-NMCA-112, ¶ 39, 125 N.M. 748, 965 P.2d 332; Ramos, 1994-NMCA-110, ¶ 13; see also Philippine Nat'l Oil Co. v. Garrett Corp., 724 F.2d 803, 806 (9th Cir. 1984) (recognizing that failure to object to a no-damages verdict at the time that it is read constitutes a waiver of any future objections to the form of the verdict and further stating that in the federal system “failure to award damages does not by itself render a verdict invalid”); Balderas v. Starks, 2006 UT App 218, ¶¶ 17-19, 138 P.3d 75 (stating that a failure to object to the sufficiency or legality of a verdict before the jury is discharged constitutes a waiver of the objection and recognizing that the waiver rule avoids “the expense and additional time for a new trial by having the jury which heard the facts clarify the [matter] while it is able to do so” (internal quotation marks and citation omitted)). {76} In Diversey, this Court explored whether a fundamental error could override the failure to timely object to an ambiguous verdict. 1998-NMCA-l 12, ¶¶ 36-40. The question of ambiguity involved whether the use of “and/or” in an instruction rendered the jury’s verdict ambiguous with the consequence thatthe jury improperly awarded a double recovery for the same injury. Id. ¶ 36. The Court determined that fundamental error generally did not apply in civil cases and limited any exception to waiver to specific “exceptional circumstances” found in four specific cases. Id. ¶ 40 (stating that fundamental error may be found in civil cases in which “substantial justice was not done, the court was deprived of jurisdiction to hear the case, the issue was one of general public interest that would impact a large number of litigants, or[] there was a total absence of anything in the record of the case showing a right to relief’ (internal quotation marks and citation omitted)). None of the exceptional circumstances exist in the present case. Furthermore, Plaintiff created all of which she now complains. {77} The jury was instructed based on UJI 13-1830 that “[t]he lawsuit has been brought by Virginia Saenz, Individually and on behalf of the estate of . . . Saenz, who is now deceased.” This instruction was adopted verbatim by the court from Plaintiffs requested UJI 13-1830 which she modified, substituting “on behalf of the surviving beneficiaries” with “on behalf of the estate[.j” The term “estate” was not defined for the jury in any jury instruction. The special verdict form given to the jury was likewise, in pertinent part relating to damages, adopted from Plaintiffs requested special verdict form. Plaintiffs requested special verdict form given to the jury did not carry out UJI 13-1830’s use note suggestion that the “various elements of damages ... be broken out separately on the special verdict form ... in order to identify damages recoverable by the estate” as distinguished from those recoverable by the decedent’s spouse and beneficiaries for loss of consortium. Thus, neither the UJI 13-1830-based instruction nor the special verdict form as given to the jury at Plaintiffs request explained the distinguishing factors inherent in “Virginia Saenz, Individually and on behalf of the estate,” as those words appeared in the instruction, or “Virginia Saenz” as the “surviving spouse,” as those would have appeared in an unmodified UJÍ 13-1830. And, importantly, Plaintiff did not point out or explain to the jury any differences or distinguishing factors about damages recovery in closing argument. {78} Plaintiff’s UJI 13-1830-based instruction could easily have given an impression to and reasonably have been interpreted by the jury to say that Virginia Saenz was entitled to one recovery encompassing both her individual and representative capacities. Plaintiff’s special verdict form did not clarify potential recoveries. The special verdict form provided a blank space for damages “suffered by Plaintiff Virginia Saenz, Individually[,]” which, given the way the instruction read, namely, “Individually and on behalf of the estate,” could reasonably be read as calling for recovery of one amount consisting of damages in both capacities. Nowhere in the special verdict form was there a separate place for the jury to consider damages recoverable by “Virginia Saenz on behalf of the estate.” Further, Virginia Saenz as “surviving spouse” appears nowhere in the special verdict form. In awarding zero as “damages suffered by the Estate of Charles Anthony Saenz” (with “the Estate” nowhere described, nowhere differentiated from “Virginia Saenz, Individually,” and nowhere indicating whether the award should be given to Virginia Saenz in her “on behalf of the estate” capacity) the jury could reasonably have concluded from the instructions, the special verdict form, and the lack of any explanation to the jury by Plaintiff, that its award of $482,000 properly included all of the compensation for “Virginia Saenz, Individually and on behalf the estate” according to Plaintiffs UJI 13-1830-based and modified instruction. (Emphasis added.) {79} During its deliberations, the jury sent a note to the court asking the following question: “Does ‘total amount of damages to the Estate of. . . Saenz’ include all amounts awarded to [Plaintiff and the children] or is it meant to be a separate amount?” This question lacked clarity. Given the manner in which Plaintiff had the jury instructed, including how her special verdict form read, the question could reasonably be interpreted as asking not whether there should be separately awarded damages pursuant to a division or distinction between “Individually” on the one hand and either “on behalf of the estate” or “the Estate” on the other hand, but whether, upon or after an award “of all amounts” to Plaintiff, individually and on behalf of the estate (and to the children), the Estate was still to receive a separate amount, The court consulted counsel for both parties regarding how to respond to the question. Initially, Plaintiffs counsel suggested sending the jury an answer saying: “Yes.” To which the court astutely responded that the problem with that answer would be that the jury would then ask, “What is the estate entitled to?” The court insightfully explained, from “looking at the damages instruction for wrongful death, ... I am not quite sure if it itemizes the damages for the estate.” The court instructed counsel to recess and look at the issue to figure out a way to respond to the note. Counsel returned with an agreed upon answer for the jury, still lacking in clarity, that read, “It is separate[,]” which the court suggested be slightly modified to state, “The ‘total amount of damages to the Estate of. . . Saenz is separate.” Both parties agreed to the court’s modification and that answer was submitted to the jury. {80} The evidence at trial was that the value of Saenz’s lost wages over the remainder of his working lifetime was estimated to be $450,000. No other dollar amounts were in evidence with respect to damages. On the face of the special verdict form, the jury awarded $482,000 in damages “suffered by Plaintiff Virginia Saenz, Individually}.]” And the jury awarded damages “suffered by” the children: to Saenz’s daughter, $50,000 and to each of Saenz’s sons, $25,000, The special verdict form made no mention of “consortium.” {81} It is reasonable to conclude that the $482,000 award to Plaintiff, individually, indicates that the jury likely included in the award “all amounts awarded to [Plaintiff]”—that is, all amounts that would flow to her “Individually and on behalf of the estate,” as instructed. This conclusion is supported, among other things, by the fact that the jury asked: “Does ‘total amount of damages to the Estate of... Saenz’ include all amounts awarded to [Plaintiff and the children,] or is it meant to be a separate amount?” The question of how much of any intended award to Virginia Saenz on behalf of the estate should flow to her as a wrongful death beneficiary under the Wrongful Death Act and how much should be allocated to Virginia Saenz, individually, for loss of consortium, is not suggested or argued by Plaintiff on appeal. See generally NMSA 1978, § 41-2-3 (2001) (governing the distribution of the proceeds of a wrongful death judgment). {82} Under the circumstances, one can reasonably assume that the jury’s award of $482,000 to “Virginia Saenz, Individually” represented more than the value of Plaintiff s loss of consortium, given Plaintiffs evidence of economic damages of $450,000. It is reasonable to conclude that, within its $482,000 award, the jury included damages to Plaintiff in both capacities, individually and on behalf of the estate, based on the instruction and special verdict form given to the jury, Plaintiff’s counsel’s misunderstanding or misinterpretation of the jury’s question and failure to ask the court to inquire further, and counsel’s failure or decision not to explain to the jury the distinctions and differences in Plaintiffs capacities, the damages elements, the commensurate recovery rights, and how the jury should read and complete the special verdict form. It is likely that the jury did not intend to award $482,000 to Plaintiff solely for consortium. {83} The outcome in this case is not a fault of the district court, and it does not fall within any of Diversey’s alternatives to fundamental error. See 1998-NMCA-l 12, ¶¶ 36-40. The outcome was the product of Plaintiff not having assured that the jury was properly and carefully instructed on the damages elements and the different capacities and recoveries, together with a conforming special verdict form. {84} The Majority holds that a failure to timely object, before the jury was discharged, to an inadequate damages award and particularly a zero damages award, as opposed to an inconsistent or ambiguous verdict, does not constitute a waiver. Majority Op. ¶¶ 50-53. New Mexico has not addressed that issue. As noted by the Majority, on the waiver issue, cases outside New Mexico have made a distinction between verdicts with alleged inadequate damage awards and verdicts that are inconsistent with respect to such awards. Id. ¶¶ 51-53. {85} The Majority’s reliance on foreign case law is misplaced. See id. ¶¶ 51-54. Each foreign authority is distinguishable for several reasons. In none of the authorities on which the Majority relies was there complicity by the plaintiff in submitting a defective or ambiguous jury instruction and special verdict form and, as here, in perpetuating a misunderstanding of the jury’s question. In none of the relied upon authorities does it appear that the plaintiff failed in closing argument to explain how to decide what to award. In none of the authorities was there a special verdict awarding substantial compensatory damages considerably close in amount to the evidence of economic damages presented in the case and reasonably interpretable to include loss of consortium. In none of the authorities was a sum awarded to a plaintiff in a wrongful death case “individually” when the award rationally could have been intended by the jury, based on its reading of the instructions and verdict form, to cover not just damages “individually” (for consortium) but also “on behalf of the estate.” {86} Zhang v. American Gem Seafoods, Inc., 339 F.3d 1020 (9th Cir. 2003), is significantly factually different from our case, and when carefully analyzed, supports this dissent. Zhang shows that the special verdict in our case consisted of two legal conclusions of damages and that, despite the claimed inconsistency, the verdict should stand. Zhang also makes clear that with general verdicts or legal conclusions in a special verdict form, such as in the present case, a party can waive a sufficiency of evidence argument when the issue does not involve factual findings of the jury in a special verdict circumstance, as here, but instead involves legal conclusions as to damages. 339 F.3d at 1031-34. Further, and significantly, the Zhang court stated: Another persuasive line of cases involves discrepancies between findings of liability and damage awards, typically arising when a jury finds liability but nonetheless awards zero damages. . . . [T]he damage award is not really a separate general verdict, but it is nonetheless a legal conclusion, and so these types of cases involve purported conflicts between two legal conclusions. . . . Justice Brandéis wrote that the trial court’s refusal to grant a new trial cannot be held erroneous as a matter of law. Appellate courts should be slow to impute to juries a disregard of their duties, and to trial courts a want of diligence or perspicacity in appraising the jury’s conduct. This rule retains vitality, and we have noted that the federal rule is that failure to award damages does not by itself render a verdict invalid. Id. at 1036 (internal quotation marks and citations omitted). {87} The outcome here stemmed from the lack of clarity of the UJI 13-1803-based instruction and the special verdict form, from the inadequate understanding of and response to the jury question, and from the failure to explain to the jury in closing argument how the awards should be made and divided, including what the “Estate” as shown in the special verdict form meant, as opposed to what “Virginia Saenz, Individually and on behalf of the estate” (as stated in the modified instruction) meant. This footprint of complicity is the culprit here, not verdict inadequacy. {88} Further, it simply cannot be disputed that the several problems created by Plaintiff could have been resolved if, upon hearing the zero damages verdict for the estate along with the substantial award to Plaintiff, individually, Plaintiff had raised the issues at the time. This would have given the district court the opportunity to consider ways in which the jury could be further instructed or the parties could make further argument to clarify and resolve questions about the verdict. {89} This case is not about exceptional circumstances, and there is no clear inadequacy in the verdict that should give rise to a new trial. This case was fully and fairly tried before a jury by experienced counsel. The district court did not abuse its discretion or otherwise err in denying Plaintiffs motion for a new trial. See id. (stating that where a jury finds liability but nonetheless awards zero damages, the “refusal to grant a new trial cannot be held erroneous as a matter of law [because ajppellate courts should be slow to impute to juries a disregard of their duties, and to trial courts a want of diligence or perspicacity in appraising the jury’s conduct” (internal quotation marks and citation omitted)). {90} In conclusion, I fully understand and am sympathetic with the difficulties even experienced litigators have in the vicissitudes, challenges, and surprises in the litigation arena. Attorneys must be immediately aware of the problematic occurrences. They must make on-the-spot decisions. Litigators ought not to enter into the fray without careful thought about every aspect of trial, from anticipating evidentiary issues, to readiness in making clear objections, to anticipating and perceiving error, to assuring clear, correct, and complete jury instructions and special verdict forms, to anticipating jury misunderstanding of instructions and forms, and to jury error. It should be the rare instance in which this Court overturns, in a fully and fairly tried case, what appears to be an ambiguous or unclear jury verdict, or even one that may appear to be inadequate, but, as here, stems from the complaining party’s own steps or mis-steps. This Court should not be in the business of saving parties from their trial strategies or missteps and forcing complete new trials on trial courts and prevailing parties under these circumstances. JONATHAN B. SUTIN, Judge The Saiz Court concluded that although the terms “peculiar risk” and “special danger” both appear in the Restatement, it would treat them as equivalent; following the Court’s lead in Saiz, I do not distinguish these terms and, for simplicity, use the term “peculiar risk” exclusively. See id. ¶ 12 n.6.